R. F. J., Estate of deceased minor
child, R. F., Estate of deceased
minor child, J. F., Estate of deceased
minor child, BRIAN CABREY,
attorney ad litem and next friend of
H.F., a minor child, and JENNIFER
SMITH, individually,

      Plaintiffs,

v.                                           Case No. 3:15-cv-1184-J-32JBT

FLORIDA DEPARTMENT OF
CHILDREN AND FAMILIES, a
governmental agency of the State of
Florida, REGINALD BRADY,
individually, and BRUCE PERRY,
individually,

      Defendants.

_____

# O R D E R

This is a tragic case. Three young children perished in a house fire along

with their grandmother, and a fourth child narrowly escaped with serious

injuries. Earlier that morning, Florida Department of Children and Families'

("DCF") employees directed the children's grandmother, who had a known

history of serious mental illness, to take custody of the children. The surviving

child, the estates of the three deceased children, and the children's mother filed

this suit against DCF, Reginald Brady (a DCF child protective investigator), and Bruce Perry (Brady's supervisor). Now, the Court must decide whether Brady and Perry's placement of the children with their grandmother was deliberately indifferent to the children's clearly established constitutional rights.

## I.     BACKGROUND[1]

On June 14, 2014, Richard Fowler, the father of the four children, was arrested while he was with his youngest child, J.F. (Doc. 106 ¶¶ 25–26). The Jacksonville Sheriff's Office determined that Fowler's neighbor, Rebecca Peoples, should take custody of J.F., and reported the situation to DCF. (Id. ¶¶ 26–29). A DCF employee directed Peoples to take J.F. to the home of the children's grandfather, Clayton Woods. (Id. ¶ 31). "By directing Peoples to take J.F. to Woods, the Defendants assumed the responsibility of finding and keeping J.F. in a safe environment and ensuring the continuing safety of that environment." (Id. ¶ 32). DCF then "directed or approved the placement" of

---

[1] Because this case is before the Court on a motion to dismiss based on qualified immunity, the Court accepts the facts in the Third Amended Complaint as true and views them in the light most favorable to Plaintiffs. Sebastian v. Ortiz, 918 F.3d 1301, 1305 (11th Cir. 2019).

R.F.J., R.F., and H.F.—Fowler's other three children who were all under the age of seven—with Woods. (Id. ¶¶ 33, 53–54).

The next day, "Brady began making the decisions regarding the care, safety and placement of the Children . . . ." (Id. ¶ 34). On June 16, 2014, Brady visited Woods's home to evaluate the living condition and supervision of the children. (Id. ¶ 36). During this visit, "Brady made it apparent to all involved that he was in control of the Children's placement, and that he had the authority to control the custodial environment of the Children." (Id. ¶ 38). After inspecting Woods's home to confirm that it was safe, and confirming that Woods could provide adequate supervision, Brady told Woods that he would inform him of the next steps the following day. (Id. ¶¶ 36–37).

> During a telephone call around 8:13 AM the following day (June 17, 2014), CPI Brady, in exercising his control of the Children's placement and custodial environment, approved, allowed, or instructed [Sheila Swearingen, the Children's grandmother,] to remove the Children from Woods' care at the New Berlin Road Residence, and to relocate . . . with the Children to 12719 Palmetto Street, Jacksonville, Duval County, Florida ("Palmetto Street Residence").

(Id. ¶ 40). "Such placement was involuntary because due to their age, the Children were subject to Brady's direction, and were unable to seek alternative living arrangements on their own." (Id. ¶ 44). Brady did not inspect the home prior to authorizing Swearingen to take them there, and the home had been unoccupied for several days. (Id. ¶ 42).

Further, Plaintiffs allege that:

54. On the morning of June 17, 2014, Brady was in possession of and had reviewed records which document at least ten incidents where Swearingen was specifically Baker Acted[2] or confronted by law enforcement for mental health issues, as well as additional criminal information supporting mental health concerns (the "Swearingen Records"). The Swearingen Records were in Brady's possession no later than the morning of June 17, 2014 (the morning of the Fire).

55. At the time of the [June 17, 2014] Meeting [of DCF employees to discuss the Children's situation], Brady was aware of the risks associated with allowing the Children to be placed in Swearingen's care and the risks associated with allowing the Children to stay at the Palmetto Street Residence without first conducting a home visit.

56. Brady reviewed the Swearingen Records prior to approving the placement of the Children in Swearingen's care and before the Meeting where he re-approved such placement.

57. The Swearingen Records contain over twenty-five encounters with the Jacksonville Sheriff's Office, including:

   a. At least eight entries that specifically indicate she was contacted for "MENTAL HEALTH" reasons.
   b. Multiple misdemeanor arrests, including arrests for trespassing, breach of peace, battery and trespassing in an occupied dwelling.
   c. Multiple felonies, including arrests for burglary, unlisted felonies and "Forcible Fondling / Indecent Liberties / Child Molesting".
   d. Multiple trespass warnings.
   e. Multiple entries indicated she is transient or homeless.

_____

2 Florida's Baker Act, Florida Statute § 394.463, allows state circuit courts, law enforcement officers, and other certain healthcare and social workers to involuntarily commit individuals for a mental health examination for up to seventy-two hours if the individual refuses voluntary examination and the individual's condition poses "a real and present threat of substantial harm to his or her well-being" or "[t]here is a substantial likelihood that . . . [the individual] will cause serious bodily harm to himself . . . or others in the near future . . . ." § 394.463.

> f. Approximately eight entries documenting reports where Swearingen was Baker Acted.

(Doc. 106).

Thus, at the time of the DCF meeting, Brady knew Swearingen's suitability as a caretaker "was a concern" and that he "wanted to remove [the children,]" but believed "there were adequate caregivers who were meeting their needs." (Id. ¶¶ 70–71). And by the end of the meeting, Perry also had "actual knowledge" of Swearingen's mental health problems, but decided "that removal was not necessary" at that time. (Id. ¶ 72). "Brady admits that after the staffing meeting, there was an urgency in getting out to the home where [Swearingen] had the Children. Despite such 'urgency', Brady waited several hours before going to the property and failed to call Swearingen, despite having her cell phone number." (Id. ¶ 73–74).

At approximately 5:40 p.m. the same day, "R.F.J., who was four years old and was not properly being supervised, was playing with a lighter and started a house fire." (Id. ¶ 91). R.F.J., R.F., J.F., and Swearingen all died in the fire. (Id. ¶ 93). H.F. survived the fire and was taken to the hospital. (Id. ¶ 95–98). At 7:25 p.m., Brady arrived at the house, which was already on fire and being attended to by fire and rescue personnel. (Id. ¶ 92). Later that evening at the hospital, Brady told the children's aunt that it was his decision to place the children in Swearingen's care. (Id. ¶ 98).

## II.   PROCEDURAL POSTURE

After Defendants removed this case, Plaintiffs filed their second amended complaint, which alleged five counts against Brady under 42 U.S.C. § 1983 for violating the children's Fourteenth Amendment substantive due process rights (Counts I through V); five counts against Perry under 42 U.S.C. § 1983 for violating the children's Fourteenth Amendment substantive due process rights (Counts VI through X);[3] and two counts against DCF for negligence under Florida's Wrongful Death Act (Count XI) and negligent infliction of emotional distress (Count XII). (Doc. 8). Brady and Perry moved to dismiss the § 1983 counts on qualified immunity grounds. (Docs. 13; 14). The Court referred the motions to the assigned magistrate judge for a report and recommendation. (Doc. 28). The magistrate judge recommended that the motions be granted, finding that a constitutional right existed but was not clearly established. (Doc. 29). All parties filed objections to the Report and Recommendation. (Docs. 30; 32; 34; 37).

On September 12, 2016, the Court held a hearing on the motions and objections to the Report and Recommendation. (Doc. 45). After post-hearing settlement discussions faltered, the Court converted the motions to dismiss into

---

[3] The claims against Brady and Perry are brought by the estates of the deceased children, an attorney ad litem on behalf of H.F., and the children's mother, Jennifer Smith.

motions for summary judgment and ordered supplemental responses after the conclusion of discovery. (Doc. 51). Brady and Perry appealed the decision and requested that the Court stay discovery pending a decision from the Eleventh Circuit, (Doc. 60). The Court stayed discovery on the § 1983 claims but allowed discovery to continue for the state law claims against DCF. (Doc. 71). After the Eleventh Circuit set the appeal for oral argument, Plaintiffs filed a motion to amend the complaint, (Doc. 99), on which this Court deferred ruling until the Eleventh Circuit issued an opinion on the interlocutory appeal, (Doc. 102). The Eleventh Circuit vacated the order converting the motions to dismiss to summary judgment motions, finding that Brady and Perry were entitled to a ruling on their motions to dismiss, but also allowed this Court to grant Plaintiffs leave to amend their complaint. <u>R.F.J. v. Fla. Dep't of Children & Families</u>, 743 F. App'x 377, 380 (11th Cir. 2018).

After the mandate issued, the Court permitted Plaintiffs to amend their complaint. (Doc. 105). The Third Amended Complaint alleges the same claims but adds additional facts in support. (<u>Compare</u> Doc. 8, <u>with</u> Doc. 106). Currently before the Court are Brady and Perry's motions to dismiss the Third Amended Complaint. (Docs. 107; 109). Plaintiffs responded, (Docs. 112; 113), Perry and Brady filed replies, (Docs. 119; 120), and Plaintiffs filed a sur-reply, (Doc. 121). On May 21, 2019, the Court held a hearing on the motions, the record of which is incorporated herein. (Doc. 125). After the hearing, the Court issued a short

order stating that it is going to grant the motions to dismiss, but would issue an order explaining its rulings at a later date. (Doc. 128). This is that order.

## III. DISCUSSION

Brady and Perry argue that they are protected from suit by qualified immunity because they did not violate a clearly established constitutional right. (Docs. 107; 109). "Government officials performing discretionary functions generally are shielded from liability or suit for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Estate of Cummings v. Davenport, 906 F.3d 934, 939 (11th Cir. 2018) (alterations adopted) (quotation marks omitted) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quotations omitted) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). For qualified immunity to attach, the government official must first prove that he was acting within the scope of his discretionary authority. Davenport, 906 F.3d at 940. Once proven, the burden shifts to the plaintiff, who must demonstrate that the government actor violated a clearly established right known to reasonable persons. Harlow, 457 U.S. at 818.

The parties agree that Brady and Perry were acting within the scope of their discretionary authority, (Docs. 106 ¶¶ 12, 16–20; 107 at 11–12; 109 at 11–

12), so Plaintiffs have the burden of proving that Brady and Perry violated a clearly established right. <u>Taylor v. Hughes</u>, 920 F.3d 729, 732 (11th Cir. 2019). When analyzing a claim of qualified immunity on a motion to dismiss, the court must determine "whether, under [Plaintiffs'] most favorable version of the facts alleged, defendant's actions violate clearly established law." <u>Powell v. Ga. Dep't of Human Res.</u>, 114 F.3d 1074, 1077 (11th Cir. 1997) (quotation marks omitted) (quoting <u>Fortner v. Thomas</u>, 983 F.2d 1024, 1028 (11th Cir. 1993)).

### A. Violation of a Constitutional Right

Plaintiffs contend that Brady and Perry violated the children's constitutional rights by being deliberately indifferent to a serious risk of harm. (<u>E.g.</u>, Doc. 106 ¶¶ 104–24); <u>see Hughes</u>, 920 F.3d at 732 ("There are two parts to the qualified-immunity analysis: (1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct.").

### 1. The children had a constitutional right to reasonably safe living conditions.

"[I]n certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 198 (1989):

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

Id. at 200 (citing Estelle v. Gamble, 429 U.S. 97, 103–04 (1976); Youngberg v. Romeo, 457 U.S. 307, 315–16 (1982)). A state's affirmative duty of care in custodial settings was originally developed in the prison context under the Eighth Amendment, Estelle, 429 U.S. at 103–04, and has been extended through the Fourteenth Amendment to other classes of individuals, City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) (pretrial detainees); Youngberg, 457 U.S. at 314–25 (involuntarily committed mental patients).

Similarly, foster children have a Fourteenth Amendment liberty interest in reasonably safe living conditions. Taylor ex rel. Walker v. Ledbetter, 818 F.2d 791, 795–97 (11th Cir. 1987) (en banc) ("With contemporary society's outrage at the exposure of defenseless children to gross mistreatment and abuse, it is time that the law give to these defenseless children at least the same protection afforded adults who are imprisoned as a result of their own misdeeds."). "The state's action in assuming the responsibility of finding and keeping the child in a safe environment places an obligation on state officials to ensure the continuing safety of that environment. The failure to meet that obligation

constitutes a deprivation of liberty under the [F]ourteenth [A]mendment." Ray v. Foltz, 370 F.3d 1079, 1082 (11th Cir. 2004) (citing Taylor, 818 F.2d at 795).

Brady and Perry argue that substantive due process is not implicated here because the children were not in foster care. (Docs. 107 at 5; 109 at 5). They advocate a bright line rule that whenever the state places a child with a relative without first taking custody, the Fourteenth Amendment is not implicated. It follows, according to Brady and Perry, that because the children were never taken into state custody, Brady and Perry could not have violated their rights. See Docs. 107 at 12–16; 109 at 12–13 (arguing that DeShaney, 489 U.S. at 196, Powell, 114 F.3d at 1079, and Wooten v. Campbell, 49 F.3d 696, 699–701 (1995) support the proposition that there was no state action in this case). The Court is unpersuaded.

Children do not need to be placed into foster care for a constitutional duty to arise—it is sufficient if the state affirmatively places the children with a person of the state's choosing and restrains the children's freedom to act on their own behalf. See DeShaney, 489 U.S. at 200; Wooten, 49 F.3d at 699. Thus, Brady and Perry's claim that Swearingen, the grandmother, was "in no sense a state actor," (Doc. 107 at 16 (citing DeShaney, 489 U.S. at 201)), is inapposite. Although, Swearingen was not a state actor in the same way a licensed foster parent might be, she was nonetheless the "person[] the state ha[d] chosen" to care for the children. Wooten, 49 F.3d at 699. If state officials affirmatively act

11

to remove children and place them with an individual the state officials have chosen, they cannot avoid their obligation to ensure reasonably safe living conditions simply because the person chosen is not a state-licensed foster parent.

Although placement into foster care is not a prerequisite, to transgress substantive due process, the state must still do some "affirmative act of restraining the individual[s'] freedom to act on [their] own behalf . . . ." DeShaney, 489 U.S. at 200. Brady and Perry's actions constituted "state[] action in assuming the responsibility of finding and keeping the child[ren] in a safe environment . . . ." Taylor, 818 F.2d at 795. Brady, after making "it apparent to all involved that he was in control," (Doc. 106 ¶ 38), "instructed" Swearingen to remove the children from Woods's house, (id. ¶ 40); see also (id. ¶ 98 ("[T]he night of the Fire, Brady stated to Carleen Hall that it was his decision to remove the children and place them in the care of Swearingen at the Palmetto Street Residence.")).

Brady and Perry also contend that because the children were placed with a relative, no state action occurred. They assert that DeShaney, Wooten, and Powell stand for the proposition that absent placing the child in a government controlled environment—prison, mental institution, or foster home—there is no state action, especially when the children are placed with a blood relative. (Docs. 107 at 12–14; 109 at 12–16). However, a closer look at the cases reveals

that the decisive factor is not who has custody of the children, but the state's action (or lack thereof) in placing them there.

In <u>DeShaney</u>, a young boy named Joshua was repeatedly abused by his father, and the abuse was documented by the county department of social services. 489 U.S. at 192–93. Despite being aware of the abuse, the county returned Joshua to his father's custody, and he was so severely beaten that he suffered significant and permanent brain damage. <u>Id.</u> Joshua and his mother filed a § 1983 action against the county alleging it had violated Joshua's Fourteenth Amendment rights by failing to intervene and protect him against the known abuse. <u>Id.</u> at 193. The Supreme Court held that no constitutional right existed, stating:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

<u>Id.</u> at 201. The Court limited the state's affirmative duty to situations where, because of government action, the individual is unable to care for himself. <u>Id.</u> at 200.

In <u>Wooten</u>, Georgia's Department of Human Resources ("DHR") was awarded legal custody of Daniel after his father had abducted him for more than a month. 49 F.3d at 698. After DHR and Forsyth County Department of Family and Children Services ("DFACS") investigated the situation, they returned Daniel to his mother's home, while retaining legal custody, and allowed his father supervised visits once every two weeks. <u>Id.</u> After three months, DHR and DFACS allowed the father unsupervised visits with Daniel. <u>Id.</u> Several months later, Daniel's father abducted him again; but, sadly, when police found them two months later, Daniel's father had killed Daniel and himself. <u>Id.</u>

The Eleventh Circuit held that no constitutional right existed and emphasized that because Daniel was in the physical custody of his natural mother, the state had no affirmative duty to protect him. <u>Id.</u> at 699. Distinguishing Daniel's situation from that of foster care, the court stated that "[i]n a foster care situation, the state places the child, whether voluntarily or not, into the care of persons the state has chosen." <u>Id.</u> Analogizing the case to <u>DeShaney</u>, the court reasoned: "The key inquiry in this case is whether the county caseworkers controlled Daniel's life to such an extent that [his mother] could not reasonably be expected to protect him. The answer is that they did not." <u>Id.</u> at 701.

In <u>Powell</u>, a caseworker allowed a baby suspected of being abused by his mother and her boyfriend to be removed from his aunt's care and returned to

the custody of the baby's maternal grandmother. 114 F.3d at 1076. The caseworker did so despite having other alternatives. Id. The grandmother ignored the caseworker's direction to not give the child back to his mother. Id. Then, despite being told that the baby had been returned to his mother, the caseworker failed to call or meet with the baby's mother. Id. The child died two weeks later. Id. The Eleventh Circuit held that no clearly established right was violated because the caseworker's decision to allow the baby to return to the maternal grandmother was similar to "permitting the child[ren] to return to the home environment" in DeShaney and Wooten. Id. at 1080.

Brady and Perry are correct that in each case the children were with a family member, and in each case there was no constitutional violation. But, they conflate correlation with causation. The reason there was no constitutional violation was not because the children were with family members, but because there was no affirmative act by the state that rendered the children incapable of caring for themselves. DeShaney, 489 U.S. at 201; Wooten, 49 F.3d at 701; Powell, 114 F.3d at 1080. In DeShaney, the county merely returned Joshua to where he had been before—with his father. 489 U.S. at 201. In Wooten, despite the state having legal custody of Daniel, it had no constitutional obligation to ensure Daniel's safety because his mother had physical custody of him—she maintained his clothes, food, and shelter. Id. at 49 F.3d at 699–701. And in Powell, the caseworker "specifically instructed that the baby was not to be

returned to the mother in whose home the suspected abuse occurred." 114 F.3d at 1080. In each of these cases, the state did not take any affirmative act restraining the children's freedom to act on their own behalf—meaning the states' actions did not change who provided food, clothing, or shelter to the children. See DeShaney, 489 U.S. at 200. To the contrary here, "Brady made it apparent to all involved that he was in control of the Children's placement, and that he had the authority to control the custodial environment of the Children." (Doc. 106 ¶ 38).

Of course, young children cannot provide food, clothes, or shelter for themselves. Thus, a reasonable government official might ask: under what circumstances does placing young children with relatives restrict the children's freedom to act on their own behalf? The answer is when the state chooses someone different to care for the children. Here, the children's parents left them with Peoples and Woods. Had Brady and Perry allowed Peoples and Woods to continue to care for the children, there likely would be no state action— DeShaney would control. But that is not what happened. Instead, Brady exerted his power on behalf of the state and "directed placement of the Children with Swearingen at a new location." (Doc. 106 ¶ 39). This action imposed on the state the obligation to ensure the children's reasonable safety.

Other courts have found constitutional violations when state actors affirmatively place children with family members. See Rhodes-Courter ex rel.

Courter v. Thompson, 252 F. Supp. 2d 1359, 1363 (M.D. Fla. 2003); Ross v. Alabama, 15 F. Supp. 2d 1173, 1191 (M.D. Ala. 1998). In Rhodes-Courter, several DCF employees "knew that Plaintiff's grandfather had been abusive in the past and was an alcoholic, but approved placing Plaintiff with her grandfather. Later, [DCF employees] refused to remove and delayed removal of Plaintiff from her abusive grandfather's house after learning that the house continued to be unsafe." Id. The court held that the defendants were not entitled to qualified immunity because the constitutional violations at issue had been clearly established in Taylor. Id. Similarly in Ross, the district court determined that the defendant's placement of a child with a relative was sufficiently analogous to foster care that a constitutional obligation existed. 15 F. Supp. 2d at 1191.

Brady placed the children, "whether voluntarily or not, into the care of persons the state ha[d] chosen." Wooten, 49 F.3d at 699. In so doing, the state triggered its affirmative duty to protect the children. DeShaney, 489 U.S. at 199–200; Taylor, 818 F.2d at 795. Unlike, the county's actions in DeShaney, Brady and Perry's actions put the children in a worse position than if they had not acted at all. See 489 U.S. at 201. Thus, taking the facts alleged in the light most favorable to Plaintiffs, the children had a constitutional right to be placed in reasonably safe living conditions.

<u>2. Defendant Brady violated the children's
constitutional rights, but Perry did not.</u>

Having found that the children had a constitutional right, Plaintiffs must still allege that Brady and Perry violated that right, that is they must have been deliberately indifferent to a serious risk of harm. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). To establish deliberate indifference, Plaintiffs must allege that Brady and Perry (1) actually knew of a risk of serious harm; "(2) recklessly disregarded the risk of harm; and (3) this conduct was more than merely negligent." <u>Ray</u>, 370 F.3d at 1083 (citing <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999)). "Only where it is alleged and the proof shows that the state officials were deliberately indifferent to the welfare of the child will liability be imposed." <u>Id.</u> (quotation marks omitted) (quoting <u>Taylor</u>, 818 F.2d at 797). To have been deliberately indifferent, Brady and Perry "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." <u>Farmer</u>, 511 U.S. at 837. Thus, Plaintiffs must allege that Brady and Perry were actually aware the children faced a serious risk of harm and recklessly disregarded the risk in a manner that was more than mere negligence. <u>Id.</u>

Commonly, state officials are found to have been deliberately indifferent when they fail to intervene after discovering abuse by foster parents. <u>E.g.</u>, <u>Omar ex rel. Cannon v. Lindsey</u>, 243 F. Supp. 2d 1339, 1345 (M.D. Fla.), <u>aff'd</u>, 334

F.3d 1246 (11th Cir. 2003). Although <u>Taylor</u> involved physical beatings by foster parents, its holding has been extended to a variety of factual situations. <u>See, e.g.</u>, <u>H.A.L. ex rel. Lewis v. Foltz</u>, 551 F.3d 1227, 1231 (11th Cir. 2008) (alleging sexual abuse by other foster children); <u>S.K. v. Lutheran Servs. Fla., Inc.</u>, No. 2:17-cv-91-FtM-99MRM, 2018 WL 2100122, at *10 (M.D. Fla. May 7, 2018) (stating that foster children have a clearly established right to proper medical and dental treatment); <u>Smith v. Beasley</u>, 775 F. Supp. 2d 1344, 1355 (M.D. Fla. 2011) (permitting foster child to run away "in a mental and emotional state that would expose her to an unreasonable risk of harm.").

However, learning of abuse and ignoring it is not the only way state officials violate children's Fourteenth Amendment rights. <u>H.A.L.</u>, 551 F.3d at 1231. Placing children in a foster home with a known substantial risk of harm also offends substantive due process. <u>Id.</u> In <u>H.A.L.</u>, a DCF caseworker placed the plaintiffs, three children under the age of eight, in a foster home that already had three other children but was only licensed to house two. <u>Id.</u> at 1229–30. Further, the caseworker had previously placed D.C., a fourteen-year-old who had a history of aggressive sexual behavior toward younger children, with the same foster parents, and the caseworker knew the parents worked full time and allowed D.C. to supervise the younger children without adults present. <u>Id.</u> "Despite this knowledge, [the caseworker] neither implemented a plan to secure Plaintiffs' safety nor conducted a background investigation into the three foster

children already living with the [parents]." Id. at 1229–30. The plaintiffs were then sexually abused by the other foster children. Id. at 1232. The Eleventh Circuit concluded that the children had a right to be free from abuse by fellow foster children. Id.

Plaintiffs allege that Brady knew Swearingen had significant, long-standing mental health issues before he "instructed" her to take the children, (Doc. 106 ¶¶ 40, 56–57), and that this rendered her incapable of caring for the children, (Id. ¶¶ 113, 137, 161, 185, 210); see Farmer, 511 U.S. at 837 (requiring knowledge of facts to create inference and allegations that defendant drew the inference). Knowing that someone is an unfit caregiver, yet nonetheless "approving, allowing, or instructing" that person to take four children under the age of seven to a home that has been uninhabited for several days constitutes deliberate indifference. See H.A.L., 551 F.3d at 1232 (finding deliberate indifference where defendants knew of a substantial risk of child-on-child sex abuse but did nothing to implement a safety plan). Similar to the caseworkers in H.A.L., Brady "violated Plaintiffs' Fourteenth Amendment right to be free from a serious injury flowing from a known, substantial risk of serious harm." 551 F.3d at 1232.

As alleged in paragraphs 54–57 of the Third Amended Complaint and in the light most favorable to Plaintiffs, when Brady directed Swearingen to take the children from Woods, knowing Swearingen had serious mental health issues

that rendered her incapable of caring for the children, he violated the children's constitutional right to be placed in a reasonably safe environment. See H.A.L., 551 F.3d at 1232; Ray, 370 F.3d at 1082.

However, Perry's actions differ from Brady's. Plaintiffs allege no action by Perry until the 1:45 p.m. meeting on June 17, 2014, when he decided that removal from Swearingen was not necessary at that time. (Doc. 106 ¶ 72). Unlike Brady—who knew Swearingen's mental health issues made her an unfit caregiver before he instructed her to take the children—Perry's actions came after Swearingen already had custody. At most, Perry's failure to act in the less than four hours between the DCF meeting and the fire is negligence—which falls beneath the threshold of a constitutional violation. Ray, 370 F.3d at 1083 ("Deliberate indifference is not the same thing as negligence or carelessness." (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976))). Accordingly, because Perry was not deliberately indifferent, he is protected from suit by qualified immunity.

## B. Clearly Established

Although Brady committed a constitutional violation when he was deliberately indifferent to a serious risk of harm to the children, for Plaintiffs to defeat qualified immunity, they must demonstrate that the right was clearly established at the time of the violation. This can be done in one of three ways. Echols v. Lawton, 913 F.3d 1313, 1324 (11th Cir. 2019). "First, and most

commonly, a plaintiff can point to a case with 'materially similar' facts decided by the Supreme Court, the Court of Appeals, or the highest court of the relevant state." <u>Sebastian</u>, 918 F.3d at 1310. Second, Plaintiffs can point to "a broader, clearly established principle that should control the novel facts of the situation." <u>Lawton</u>, 913 F.3d at 1324 (quotation marks omitted) (quoting <u>Loftus v. Clark-Moore</u>, 690 F.3d 1200, 1204–05 (11th Cir. 2012)). However, this exception is rare and "must be established with obvious clarity by the case law so that every objectively reasonable government official . . . would know that the official's conduct [violated] federal law when the official acted." <u>Corbitt v. Vickers</u>, No. 17-15566, 2019 WL 3000798, at *7 (11th Cir. July 10, 2019) (quotation marks omitted) (quoting <u>Loftus</u>, 690 F.3d at 1205). And the Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality." <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 590 (2018); <u>see, e.g.</u>, <u>City of Escondido v. Emmons</u>, 139 S. Ct. 500, 503 (2019); <u>Corbitt</u>, 2019 WL 3000798, at *7. "Third, the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary." <u>Lawton</u>, 913 F.3d at 1324 (alterations adopted) (quotations omitted) (quoting <u>Clark-Moore</u>, 690 F.3d at 1205).

Plaintiffs concede there is no controlling case where state actors have been held to have committed constitutional violations in a materially similar situation.[4]

Plaintiffs have also failed to demonstrate that a broader established principle clearly controls this case. See Ortiz, 2019 WL 1187012, at *6 ("In some cases, . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." (quotation marks omitted) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997))). Although Taylor established that foster children have a right to be placed in a reasonably safe environment, that case and its progeny relate to state officials' failure to identify and prevent abuse in a foster home. See, e.g., 818 F.2d at 797; Ray, 370 F.3d at 1080. That state officials are liable when they are deliberately indifferent to ongoing abuse does not make it "obvious. . . [to] every objectively reasonable government official" that placing children with a relative with mental health issues also violates the Constitution. Corbitt, 2019 WL 3000798, at *7 (quoting Loftus, 690 F.3d at 1205). Neither, in light of the limitations on

_____

[4] Plaintiffs also argue that the children should not have been placed with Swearingen because she was convicted of having sex with a minor when she was in her thirties. Although such a conviction likely should have eliminated her from becoming the children's caretaker, the conviction is irrelevant in this case because it has no relation to the harm that occurred.

state officials' liability explained in <u>Deshaney</u> and other Supreme Court and Eleventh Circuit cases, can the Court find that Brady's conduct "so obviously violate[s] the Constitution that prior case law is unnecessary." <u>Lawton</u>, 913 F.3d at 1324.

Thus, although Brady had an obligation to ensure a reasonably safe living environment, <u>Ray</u>, 370 F.3d at 1082, there is no clearly established rule that placing the children with a relative, even one with a serious mental health history, would violate the children's constitutional rights. <u>See</u> <u>Corbitt</u>, 2019 WL 3000798 at *7 (explaining that "the qualified immunity analysis requires a clearly established right to be defined with specificity."). Of course, if this Court's finding that Plaintiffs have properly alleged a constitutional violation is affirmed on appeal, thereafter, the right would become clearly established.

Accordingly, it is hereby

**ORDERED:**

1. Defendant Bruce Perry's Motion to Dismiss the Third Amended Complaint (Doc. 107) is **GRANTED**.

2. Defendant Reginald Brady's Motion to Dismiss the Third Amended Complaint (Doc. 109) is **GRANTED**.

3. Counts I through X are **DISMISSED with prejudice**.

4. The Clerk shall terminate Plaintiff Jennifer Smith, who is deceased, as a party.

5. The Court will conduct an in-person case management conference on **Thursday, August 1, 2019 at 2:00 p.m.** in Courtroom 10D, United States Courthouse, 300 North Hogan Street, Jacksonville, Florida to discuss how the case should proceed, including whether the Court should enter judgment for Defendants Reginald Brady and Bruce Perry in accordance with Federal Rule of Civil Procedure 54(b) to allow Plaintiffs to immediately appeal this Court's decision. Mr. Brian Cabrey, as attorney ad litem and next friend of H.F., is also requested to appear.

      **DONE AND ORDERED** in Jacksonville, Florida this 16th day of July, 2019.

TIMOTHY J. CORRIGAN
United States District Judge

jb
Copies to:

Counsel of record

Brian Cabrey, Esq.
P.O. Box 350294
Jacksonville, FL 32235
brianjcabrey@cabreylaw.com